726 So.2d 1242 (1998)
Jimmy F. GRICE, Appellant,
v.
Lottie Louise GRICE, Appellee.
No. 96-CA-00496 COA
Court of Appeals of Mississippi.
December 30, 1998.
*1244 William R. Striebeck, Greenville, Attorney For Appellant.
Willard L. McIlwain, Jr., Greenville, Attorney for Appellee.
Before THOMAS, P.J., and COLEMAN, and HINKEBEIN, JJ.
COLEMAN, J., for the Court:
¶ 1. Jimmy F. Grice appeals from an order rendered by the Chancery Court of Washington County by which that court denied his petition to reduce or terminate alimony payments to his former wife, Lottie Louise Grice, appellee, but ordered him to pay her attorney's fee in the amount of $7,000 plus expenses in the amount of $1,057. Mr. Grice presents to this Court for its review and resolution the following four issues, which we quote verbatim from his brief:
I. WHETHER OR NOT THE CHANCELLOR COMMITTED MANIFEST ERROR IN REFUSING TO REDUCE JIMMY'S ALIMONY OBLIGATIONS?
II. WHETHER OR NOT THE CHANCELLOR COMMITTED MANIFEST ERROR IN FINDING THAT LOUISE GRICE'S MONTHLY LIVING EXPENSES WERE APPROXIMATELY $2,045.00 PER MONTH?

*1245 III. WHETHER OR NOT THE CHANCELLOR COMMITTED ERROR IN AWARDING LOUISE $8,057.00 FOR HER ATTORNEY'S FEES AND EXPENSES?
IV. WHETHER THE CHANCELLOR ERRED WHEN SHE REQUIRED THE APPELLANT TO PAY THE EXPENSES OF THE APPELLEE'S AMENDED DESIGNATIONS?
This Court resolves all four issues adversely to Mr. Grice and affirms the order of the Washington County Chancery Court.

I. FACTS
¶ 2. Jimmy F. Grice, appellant, and Lottie Louise Grice, appellee, married on September 4, 1964. One child, Jimmy F. Grice, Jr., was born of their marriage on October 18, 1967. In 1979, Mr. Grice began a commercial seining operation for farmers who were just beginning the commercial production of catfish in the Mississippi Delta. His then-wife, Louise Grice, participated in the operation and management of the seining business as her husband's bookkeeper. Mr. Grice's seining business operated two crews, each of which was composed of one foreman and four workers.
¶ 3. Ms. Grice had been married once previously to Andrew Suber. Four children, George, Bobby, Glenda, and Danny, were born of that marriage. Bobby Suber, a recipient of Social Security disability benefits, lived with Ms. Grice. Ms. Grice's brother, Joe Johnston, a recipient of Supplemental Security disability benefits, lived either with Ms. Grice or with Ms. Grice's sister, Varine Stroad. In the past, other members of Ms. Grice's family, including her daughter, Glenda Bennett, and Ms. Bennett's two children also lived with her.
¶ 4. After the chancery court awarded Ms. Grice a divorce from Mr. Grice on January 9,1987, Mr. Grice married his present wife, Freida Grice, in February of 1987. In 1991, Freida Grice purchased the equipment used in her husband's seining business from her husband and incorporated the business as Grice Seining, Inc. Freida Grice had a daughter, Jacqueline Drake Grice, by her previous marriage. Mr. Grice adopted Jacqueline, who was attending Mississippi State University when this case was tried.

II. PRIOR LITIGATION
¶ 5. Mr. and Ms. Grice separated in February of 1986, and Ms. Grice filed for divorce on April 10, 1986. On January 9, 1987, the Washington County Chancery Court issued a "Ruling of the Court" by which it awarded a divorce to Ms. Grice on the ground of cruel and inhuman treatment. The chancellor awarded Ms. Grice custody of the couple's minor child, Jimmy Grice, Jr., and use of the marital home until June 1, 1987, after which the house would be subject to partition at the request of either party. Child support was not awarded as Jimmy was working for his father's business, for which Mr. Grice paid him $180 per week. The Court awarded Ms. Grice periodic alimony in the amount of $1,000 until May 1997 when that amount would be reduced to $750 per month. The chancellor also awarded Ms. Grice attorney's fees in the amount of $1,000.
¶ 6. In an order rendered on July 26, 1989, the chancery court found that Mr. Grice had failed to pay Ms. Grice the $1,000 in attorney's fees previously awarded and awarded her a judgment "for said sum" against Mr. Grice. Next, the chancellor found that there had been a material change in Ms. Grice's circumstances because Ms. Grice's physical condition had deteriorated and thus diminished her present ability to work. He further found that Ms. Grice's expenses had increased because of her deteriorating "physical and medical condition." Based on these findings, the chancellor increased Ms. Grice's award of periodic alimony to $1,500 per month from August 1, 1989, to February 1, 1990. Ms. Grice was then to submit a doctor's statement regarding her ability or inability to become employed. If the parties were unable to agree upon an amount of alimony, the chancellor's order stated that an immediate hearing would be held to determine *1246 the appropriate amount of alimony. Finally, the chancellor awarded Ms. Grice $750 in attorney's fees.
¶ 7. On April 30, 1990, the Grices were before the chancery court once againthis time to address Ms. Grice's petition to the court to extend alimony payments. The court found "[t]hat Ms. Grice [was] unable to have surgery at [that] time due to her heart condition." As a result, the chancellor awarded Ms. Grice periodic alimony in the amount of $2,000 per month beginning May 1, 1990, for a period of three months, after which it was to be reduced to $1,500 per month. The court further "direct[ed] that from the sale of any of her real estate, Louise Grice use the proceeds to retire [her] debt to the Bank of Hollandale and direct[ed] any sums remaining after retiring [Ms. Grice's] debt to the Bank of Hollandale to be paid to her other creditors." The chancellor also awarded Ms. Grice attorney's fees in the amount of $750. Mr. Grice has continued to pay his former wife permanent alimony at the rate of $1,500 per month.

III. CURRENT LITIGATION
¶ 8. On September 13, 1994, Mr. Grice filed a petition to terminate or reduce the monthly alimony of $1,500 which he had been paying Ms. Grice. He alleged that a substantial material change in circumstances had occurred because "as a result of deteriorating health, [he had] been forced to cease his active role in his seining business [and][t]hat as a necessary result thereof, he ha[d] had a reduction in his monthly and yearly income." Mr. Grice further alleged that his former wife, Louise Grice, had "never attempted to obtain any gainful employment." Mr. Grice denied that Ms. Grice was medically disabled from obtaining gainful employment. As yet another material change in circumstance, Mr. Grice asserted that his former wife had "experienced an increase in her assets and financial ability to support herself."
¶ 9. After Ms. Grice filed her answer and cross-motion for increase in alimony payments, to which Mr. Grice responded by filing a first amended petition to terminate or reduce periodic alimony payments, the chancellor conducted a two-day hearing on the issues which the Grices had raised. We reserve our review of the testimony and evidence which the Grices adduced during this hearing for our analysis and resolution of Mr. Grice's four issues. After the hearing concluded, the chancellor recessed court so that she might review the extensive exhibits and prepare to deliver her opinion from the bench. Again, we reserve further recitation of her findings of fact for our consideration of Mr. Grice's four issues. Pursuant to the chancellor's ruling from the bench, she entered an order in which she: (1) denied Mr. Grice's petition and first amended petition to reduce or terminate his payment of alimony to Louise Grice, (2) awarded Louise Grice her attorney's fee in the amount of $7,000 and his expenses in the amount of $1,057, and (3) deemed her bench ruling which she attached to the order "to be this Court's findings of fact and conclusions of law as were requested by Mr. Grice in his [Mississippi Rule of Civil Procedure 52(a)] request."
¶ 10. Jimmy Grice designated parts of the record as necessary to be included in the appeal pursuant to Rule of Appellate Procedure 10(b)(1), and as Rule of Appellate Procedure 10(b)(4) requires, Mr. Grice filed his declaration of issues to present on appeal.[1] Counsel for Ms. Grice responded by designating *1247 all exhibits introduced into evidence by either party. As a result, Mr. Grice received an additional estimate of cost for including all the exhibits in the amount of $1,466. The original estimate of cost had been $1,099. Counsel for Mr. Grice filed an "appellant's application to trial court for order requiring appellee to pay expense of additional designations," but the chancellor denied Mr. Grice's application by entering an order that "[t]he Appellant shall pay the expense of the Appellee's additional designations." The additional exhibits which Ms. Grice designated for inclusion in the report were all the Grices' personal income tax returns and the corporate income tax returns for Jimmy Grice Seining, Inc., for the years 1989 through 1995, medical records from Dr. Ben Folk on Louise Grice, a handwritten list of Ms. Grice's medications to which she testified during the trial, and a collective exhibit of various bills which Ms. Grice owed.

II. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Mr. Grice's second issue

1. Mr. Grice's argument
¶ 11. This court first reviews Mr. Grice's second issue because it is included within his first issue. Mr. Grice's second issue is whether "the chancellor committed manifest error" when she found "that Louise Grice's monthly living expenses were approximately $2,045.00 per month." In her bench ruling, the chancellor noted, "Her [Ms. Grice's] expenses according to her financial statement are approximately $2,045 per month." The chancellor found in the order which she rendered on April 2 pursuant to her bench ruling that "Louise Grice's expenses, according to her financial statement, are approximately $2,045.00 per month." (emphasis added). Mr. Grice attacks the chancellor's finding that Ms. Grice's living expenses were "approximately $2,045.00 per month" on three fronts: (1) Ms. Grice's debt owed to Bank of Hollandale, (2) her exaggeration of her monthly medical expenses based upon the amounts of her pharmaceutical bills introduced into evidence, and (3) her son, brother, daughter, and other family members from her first marriage to Andrew Suber lived in her home and thus paid their share of Ms. Grice's living expense, for which she failed to account in her financial statement required by Rule 8.05 of the Uniform Chancery Court Rules. The yarn with which Mr. Grice weaves his attacks together is Ms. Grice's paying all of her bills in cash because she elected not to maintain a checking account in any bank.
¶ 12. Even if the chancellor's finding that Ms. Grice's living expenses were "approximately $2,045.00 per month" was manifestly wrong because it was not supported by substantial evidence, Mr. Grice fails to explain the impact of this specific actual error on the chancellor's dismissal of his petition and first amended petition to modify or to reduce his payment of alimony to Ms. Grice.

2. Ms. Grice's response
¶ 13. Ms. Grice counters Mr. Grice's argument about her debt owed Bank of Hollandale, which we will subsequently review, by pointing out that two of her four monthly payments to the bank were never included in her Rule 8.05 financial statement but were instead reported against her income which she realized from the rental and sale of portions of her land. About her Suber family members who were living with her, Ms. Grice emphasizes that she testified that her monthly living expense of $2,045 represented only her share of the household expense and that the Social Security benefits which her brother received and the Supplemental Security Income benefits which her son received were *1248 used to support them and to pay their share of Ms. Grice's household expenses. Ms. Grice does not respond to Mr. Grice's criticism of her monthly medical expense. Before this Court reviews Mr. Grice's three bass of attack upon the chancellor's finding that "according to her financial statement," Ms. Grice's living expenses were "approximately $2,045.00 per month," it must first establish an appropriate standard of review by which it may determine whether this finding by the chancellor was erroneous.

3. Standard of review
¶ 14. Our review is limited in domestic relations cases where the chancery court has decided upon alimony; the trial court's determination will not be altered on appeal unless we find it to be against the overwhelming weight of the evidence or manifestly in error. Ethridge v. Ethridge, 648 So.2d 1143, 1145-46 (Miss.1995); Crowe v. Crowe, 641 So.2d 1100, 1102 (Miss.1994); Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992). We afford the chancellor wide discretion in alimony cases, and this discretion will not be reversed on appeal unless the chancellor was manifestly in error in the findings of fact or there was an abuse of the court's discretion. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993).
¶ 15. In regard to the chancellor's findings of fact, the reviewing court will not "disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Turpin v. Turpin, 699 So.2d 560 (¶ 14) (Miss.1997)(quoting Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990)); Anderson v. Anderson, 692 So.2d 65, 72 (Miss.1997). All reasonable inferences which favor the trial court's decision will be accepted. Anderson, 692 So.2d at 70. Therefore, the reviewing court will not disturb the chancellor's conclusions, "notwithstanding that we might have found otherwise as an original matter" if substantial evidence exists to support his fact-findings. Dunn v. Dunn, 609 So.2d 1277, 1284 (Miss.1992); see also Turpin v. Turpin, 699 So.2d at 564 (¶ 14) (Miss. 1997); Newsom v. Newsom, 557 So.2d 511, 514 (Miss.1990).

4. Bank of Hollandale debt
¶ 16. In its order rendered on April 30, 1990, the chancery court directed "that from the sale of any of her real estate, Louise Grice use the proceeds to retire the debt to the Bank of Hollandale and ... any sums remaining after retiring the debt to the Bank of Hollandale ... be paid to her other creditors." However, in her Rule 8.05 financial statement which she filed for the current phase of this case, Ms. Grice listed the following four monthly payments which she was making to the Bank of Hollandale: (1) $250 for her home mortgage, (2) $345 for her car payment, (3) $216 for her land payment, and (4) $242 for her other land payment. The sum of these four monthly payments was $1,053.
¶ 17. Mr. Grice's complaint about his former wife's debt which she owed Bank of Hollandale is two-fold. First, he notes that Ms. Grice apparently failed to comply with the mandate contained in the chancery court order rendered April 30, 1990, that she use the proceeds from the sale of her land to retire her debt to the bank. Secondly, Mr. Grice argues that because she failed to use the proceeds from the sale of her land as the chancery court ordered her to do, Ms. Grice was not entitled to claim the sum of all four monthly payments, $1,053, in her Rule 8.05 financial statement. Mr. Grice reasons that because Ms. Grice was not entitled to claim the sum of these payments as a part of her monthly living expense, the chancellor erred when she found that Ms. Grice's monthly living expense was "approximately $2,045.00 per month." Instead, Mr. Grice contends that the correct amount for his former wife's monthly living expense ought to have been $2,045 minus $1,053, or $992, which was less than one-half of Ms. Grice's estimate contained in her Rule 8.05 financial statement.
¶ 18. Ms. Grice counters her former husband's argument by contending that the only *1249 debts to the Bank of Hollandale which she included in her monthly living expense were the payments on her home mortgage of $250 and on her automobile of $345. Ms. Grice had attached to her Rule 8.05 financial statement an exhibit, the subject of which was the income she realized from renting various mobile home lots on her land. According to that exhibit, Ms. Grice received $1,035 per month from renting to ten tenants, but she incurred monthly expenses of $840.66, for a net income of $194.34 per month. Ms. Grice points out that she included the total of her two monthly land payments, $458.66, in her monthly expenses of $840.66.
¶ 19. While Mr. Grice complains that Ms. Grice apparently violated the April 30, 1990, order that she retire her debt to the Bank of Hollandale from the proceeds of the sale of portions of her land, Mr. Grice did not charge that his former wife's failure to retire her debt to the Bank of Hollandale constituted contempt of that order. Mr. Grice called Wesley Cope, the chairman of the board and CEO of the Bank of Hollandale, to testify about Ms. Grice's indebtedness to that bank. His testimony combined with our review of Ms. Grice's Rule 8.05 financial statement confirms that her argument does not misrepresent the financial data and calculations found in it; thus, we reject Mr. Grice's argument that the chancellor erred by not reducing Ms. Grice's monthly living expense by the sum of her four monthly payments to the Bank of Hollandale.

5. Ms. Grice's monthly medical expenses
¶ 20. Although Ms. Grice claimed an average monthly medical expense of $250, of which "medicine alone [was] over $150," Mr. Grice correctly states that the sum of Ms. Grice's pharmacy bills, which she produced in response to Mr. Grice's request for them, was $73.02 for 1993, $290.14 for 1994, $692.75 for 1995, and $128.21 through April 1,1996, the date that the trial began. These sums alone do not support Ms. Grice's claim for an average monthly expense of $250. Ms. Grice testified about seven prescribed medications, including Norvase, Premarin, Lasix, Tenormin, Axid, Hydroxyz, and Panfil-G, all of which she took daily for problems relating to her cardiovascular disease. Under cross-examination by Mr. Grice's counsel, Ms. Grice attempted to explain that she purchased her pharmaceuticals from two different stores and that her counsel may have provided Mr. Grice's counsel with only her pharmaceutical bills from one store.
¶ 21. Ms. Grice's personal physician, Dr. John Estess of Hollandale, was called by Mr. Grice as an adverse witness with the chancellor's leave. The gist of Dr. Estess's testimony was that Ms. Grice's health was poor. Dr. Estess opined that his patient suffered from cardiovascular and pulmonary illness. The record contains other evidence, including Ms. Grice's testimony, about her history of poor health, including consultation with or treatment by specialists in Jackson and Greenville. Ms. Grice also introduced bills from a hospital and some of her physicians which had unpaid balances.
¶ 22. From our review of the foregoing evidence, we conclude that the discrepancy between the sums of Ms. Grice's pharmaceutical bills for the years 1993 through 1996 and her claimed average monthly medical expense of $250, of which $150 were attributable to prescription medications, is an insufficient basis on which to conclude that the chancellor's finding that Ms. Grice's monthly living expense was approximately $2,045 was so manifestly wrong that we must reverse the order from which Mr. Grice has appealed. This is especially true since Mr. Grice fails to relate the chancellor's finding to a material change for the better in Ms. Grice's circumstances since the entry of the order on April 30, 1990.

6. Other members of Ms. Grice's household
¶ 23. Ms. Grice testified that her brother, Joseph Johnston, who alternated living with her sister and Ms. Grice, received a Supplemental Social Income disability benefit check in the amount of $470 and that her son, Bobby Suber, who also lived with her, received *1250 a Social Security disability benefit check in excess of $500 per month. Her son Bobby also received food stamps in the amount of $44 per month. Mr. Grice argues that "it is axiomatic that a portion of the alimony paid to Louise [Grice] is being used for [Bobby and Joseph Johnston's] support and expense."
¶ 24. In her Rule 8.05 financial statement, Ms. Grice claimed a monthly expense for "food and household supplies" in the amount of $200 "just for Louise." Under cross-examination, Ms. Grice testified that "[w]hat [her son and her brother] get is used to take care of them." She acknowledged that "Bobby ... had to give me money on utilities, he and Joe [her brother] both." However, Ms. Grice maintained that "[b]y the time they buy their clothes, food, pay for medicine that Medicaid don't [sic] pay for, they do not have any left." Once more, we decline to hold that the chancellor was manifestly wrong in her finding that Ms. Grice's average monthly living expense was $2,045 simply because two members of her household received modest disability benefits.

7. Summary of the second issue
¶ 25. Regardless of the manner in which Ms. Grice managed her debt to Bank of Hollandale, the apparent discrepancy between Ms. Grice's claimed monthly medical expense of $250 and the sums of her pharmaceutical bills, and the presence of her son and brother in her home, the chancellor did not err when she found in the order rendered on April 2 that "Louise Grice's expenses, according to her financial statement, are approximately $2,045.00 per month." Substantial evidence supported her finding, especially in the absence of evidence to the contrary. Had the chancellor erred, however, Mr. Grice fails to relate that error to a reason for the reversal and remand of the order which included her finding. Thus, we resolve his second issue adversely to Mr. Grice.

B. Mr. Grice's first issue

1. Mr. Grice's argument
¶ 26. Mr. Grice's first issue is "whether ... the chancellor committed manifest error in refusing to reduce [his] alimony obligations." In her bench ruling, the chancellor found: "That Mr. Grice's income has increased and he enjoys a very good style of living." The chancellor further accepted the opinion of Dr. John Estess, a family practitioner and Ms. Grice's personal physician for many years, that Ms. Grice had been disabled since 1993. The chancellor incorporated these particular findings within the order dated April 2, from which Mr. Grice has appealed.
¶ 27. Mr. Grice questions these findings by offering a two-pronged argument on this issue. First, he argues that the chancellor erred when she found that Mr. Grice's income had increased. Secondly, he argues that the chancellor was manifestly wrong when she accepted Dr. Estess's opinion that Ms. Grice "had been disabled since 1993."

2. Ms. Grice's counter-argument
¶ 28. Ms. Grice counters the first prong of her former husband's argument with the assertion that "immediately following the last hearing in 1998, [Jimmy Grice] began an intentional campaign to show a reduction in income and assets." To support her counter-argument, Ms. Grice cites the testimony of Freida Grice, the current wife of Jimmy Grice, that she purchased Jimmy Grice's assets which were used in his seining business and then incorporated that business. Freida Grice owed 95% of the shares of stock in Jimmy Grice Seining, Inc., and Jimmy Grice's sister, who also owed the home in which Jimmy and Freida Grice lived, owned the remaining 5% of the shares of stock. Ms. Grice continues that "[w]hile [Mr. Grice] may be able to show a reduction of income on paper to himself, it is clear that he leads an extravagant lifestyle and has continued to have substantial assets and income."
¶ 29. Ms. Grice counters the second prong of her former husband's argument by citing Dr. Estess's opinion as her family physician for many years that she had been disabled since 1993, and she reviews other medical evidence from other physicians who had examined or treated her for cardiovascular or pulmonary illness.

*1251 3. The General law on the award and modification of alimony

¶ 30. At the request of either party, periodic alimony may be modified by increasing, decreasing, or terminating the award via court order. McDonald v. McDonald, 683 So.2d 929, 931 (Miss.1996); Armstrong, 618 So.2d at 1281. Accordingly, chancellors are vested with the authority to modify awards of periodic alimony where they find that there has been a "substantial change in circumstances." McDonald, 683 So.2d at 931. An award of alimony can only be modified where it is shown that there has been a material change in the circumstances of one or both of the parties. Varner v. Varner, 666 So.2d 493, 497 (Miss.1995). "The change must occur as a result of after-arising circumstances of the parties not reasonably anticipated at the time of the agreement," Varner, 666 So.2d at 497, and must "be one that could not have been anticipated by the parties at the time of the original decree." Tingle v. Tingle, 573 So.2d 1389, 1391 (Miss.1990). Personal obligations or debts cannot be the basis for a reduction in support payments. Varner, 666 So.2d at 497. Further, no modification will be allowed where one party has taken action in bad faith to purposely diminish his financial position to the point that he is no longer able to pay alimony. Id.

4. Increase in Mr. Grice's income from 1991 to 1995
¶ 31. Mr. Grice successfully disputes the chancellor's basis for determining that he had experienced an increase in his personal income from 1991 until 1995. First, we review the chancellor's findings in her bench ruling. She noted:
[T]he 1991 corporate return shows a gross income of $258,089. The 1995 corporate return shows $290,233, which would be an increase. The 1991 corporate return ... $35,385 in ordinary income as compared to 1995's $40,572 ordinary income. The Court notes that Mr. Grice and the present Ms. Grice [Freida] filed separate returns even though it may cost more in taxes.
Mr. Grice correctly points out that the chancellor ignored Freida Grice's testimony about her purchase of her husband's assets used in his seining operation and incorporation of that business effective as of May 9, 1991. The chancellor evidently ignored this testimony because the chancellor ignored the financial data contained in the partnership return which Jimmy and Freida Grice filed for their seining business for the period from January 1 until May 8, 1991.
¶ 32. Mr. Grice is quick to argue that "[t]he Chancellor committed manifest error by failing to consider the partnership income from 1991 of the Jimmy Grice Seining partnership." He then emphasizes that the partnership return for hardly five months in 1991 reported "gross receipts of $182,844.00; total income of $132,820.00 and ordinary income from the business of $57,668.00." Mr. Grice then cites the testimony of James Bennett, C.P.A., taken by deposition but introduced into evidence during the trial, that the addition of $182,844 from the partnership return to $258,089, the amount of gross receipts reported on the corporate return for 1991, yields "a total sum of $440,933.00." Thus, according to Mr. Grice, "The chancellor made a $182,844.00 mistake in gross returns alone."
¶ 33. Mr. Grice continues his criticism of the chancellor's error by noting that the partnership return for 1991 reflected ordinary income in the amount of $57,668 and that the corporate return for the remainder of 1991 reported ordinary income in the amount of $35,385. He then concludes his analysis by demonstrating that the sum of these two amounts, $93,053, exceeds the ordinary income reported on the 1995 corporate return in the amount of $40,572. Ergo, "Simple mathematics indicate[s] there was a 43.60% decrease in ordinary income in 1995 as compared to 1991 in regards to the seining business from which Jimmy derived his personal annual income."
¶ 34. Mr. Grice then focuses on his 1995 personal income tax return on which he reported that he had $21,508 in total income *1252 but only $3,508 after he adjusted that figure by subtracting the $18,000 in alimony which he paid Ms. Grice that year. While Mr. Grice began his argument by noting that he provided evidence of his current wife's income even though he was not required to do so, he nevertheless complains that the chancellor "erred further by lumping or attempting to lump all of Freida Grice's income with that with Jimmy's." He argues, "In effect, the chancellor has required Freida Grice's earnings to be added to Jimmy's and to require her to assist in with the paying of alimony to Louise. This amounts to clear and manifest error...."
¶ 35. It is true that Mr. Grice reported gross income of $42,401 and adjusted income of $23,624 on his individual 1040 form for 1991. Of the $42,401 in gross income, $25,500 was listed as wages or salaries and $11,000 was listed as business income. As Mr. Grice emphasized in his argument, 1991 was the year that both the partnership and the corporation earned a gross sum of $440,933. Mr. Grice's personal share of that amount was less than 10%. Freida Grice's 1040 form for 1991 reflected a gross income of $89,672, of which $91,790 represented "rents, royalties, partnerships...." The reduction of her gross income by $2,486 resulted from a farm loss for that year.
¶ 36. We noted Ms. Grice's argument that following the 1990 hearing, Mr. Grice began to convey assets to his current wife Freida "including the business." She continued, "If one can escape alimony simply by conveying to a new wife his business, it would be a grossly and inequitable way for the Court to allow a man to escape his obligations to an ex-wife of many years who is in poor health." Indeed, in her bench ruling, the chancellor found "a pattern since the last hearing before this Court of Mr. Grice's transferring assets and his business to the present Mrs. Grice." The chancellor continued, "The Court never received a satisfactory explanation of the purpose behind these transactions." The chancellor specifically incorporated verbatim these findings into her order rendered April 2, 1996. Mr. Grice does not attack these particular findings as being manifestly wrong.
¶ 37. There was an entirely different aspect of this issue which Mr. Grice elected not to attack as manifest error on the chancellor's part. The chancellor found that "Mr. Grice and the present Ms. Grice [Freida] enjoy a very good standard of living." Witnesses for the Grices established that in 1995 the Jimmy Grice Seining corporation purchased: (1) a 1996 Ford 250 pickup which cost "somewhere between $16,000 and $20,000," for Mr. Grice's use, (2) a 1994 Lexus automobile with 30,000 miles which cost $32,000 for Freida Grice's use, and (3) a 1995 Nissan Maxima automobile for Freida Grice's daughter by an earlier marriage, whom Mr. Grice adopted after he married Freida Grice, for $26,000. Jimmy and Freida Grice paid Jimmy Grice's sister rent of approximately $10,000 annually for her home located on Lake Ferguson but which they used as an office for the seining corporation. The chancellor further found from the evidence adduced by the Grices that Mr. Grice and his current wife Freida owned a rental house, belonged to the local yacht club, and that Mr. Grice belonged to the Kilmichael hunting club. The chancellor opined in her bench ruling, "It appears to this Court [that] if Mr. Grice's finances are as he would have this Court to believe, he and the present Mrs. Grice would have made the appropriate changes in their lifestyle."
¶ 38. Based upon our foregoing review and analysis of the respective arguments of Mr. Grice and his former wife, Louise Grice, we are compelled to conclude that the chancellor's finding that "Mr. Grice's income has increased, and he enjoys a very good style of living," which she incorporated into the order dated April 2, 1990, was supported by substantial evidence and could therefore hardly constitute "manifest error" as Mr. Grice argues before this Court. Therefore, we reject the first prong of his argument.

5. Ms. Grice's disability
¶ 39. We noted that the chancellor accepted the opinion of Ms. Grice's family physician, *1253 Dr. John Estess, that Ms. Grice had been disabled since 1993. Mr. Grice aggressively criticizes Dr. Estess's competency as a family practitioner to assert that opinion. We note, however, that Mr. Grice did not object to Dr. Estess's qualification as a family physician when he called Dr. Estess adversely. The record reflects that Ms. Grice's health was poor by October 1,1990, the date of the last hearing which addressed the matter of the amount of alimony which the chancery court required Mr. Grice to pay his former wife.
¶ 40. The record contains letters and reports from a heart specialist in Jackson, a heart specialist in Greenville, and a general surgeon in Indianola. The cumulative evidence establishes that Ms. Grice suffered not only from progressive ischemic heart disease but also a hiatal hernia and pulmonary difficulties. We previously reviewed the list of prescribed medications which Ms. Grice took daily. This Court finds it unnecessary to analyze further the medical evidence which related to Ms. Grice's disability as opined by the only physician who testified, Dr. Estess, simply because the record contains no evidence that the state of Ms. Grice's health had improved since the last hearing in October 1990. This Court does find, however, that Dr. Estess's opinion that Ms. Grice had been disabled since 1993 combined with the remainder of the evidence in the record was sufficiently substantial to support chancellor's finding that "Mrs. Grice's health has deteriorated since the last hearing and order of this Court." Therefore, we reject Mr. Grice's second prong of his argument.

6. Summary of the first issue
¶ 41. While Mr. Grice won a couple of skirmishes about the chancellor's erroneous finding of specific facts, he must lose the battle of this issue. There was substantial evidence to support the chancellor's finding of "a pattern ... of Jimmy F. Grice's transferring assets in his business to the present Mrs. Grice." There was substantial evidence to support the chancellor's finding that Mr. Grice "enjoy[ed] a very good style of living." The evidence was uncontradicted that Jimmy Grice Seining, Inc., purchased a Ford pickup truck for Mr. Grice, a Lexus for Freida Grice, and a Nissan Maxima for their daughter, as the chancellor found. Regardless of whether Dr. Estess's opinion that Ms. Grice had been disabled since 1993 was credible, the entirety of the evidence about the state of Ms. Grice's health clearly supported the chancellor's finding that "Louise Grice's health has deteriorated since the last hearing before this Court." Only an improvement in the state of Ms. Grice's health could have constituted a material change in circumstance which would have perhaps warranted a reduction in Mr. Grice's payment of alimony to his former wife. Because all of these findings of fact were supported by substantial evidence, which means that the chancellor was not manifestly wrong in making them, we affirm the chancery court's order which denied Mr. Grice's petition and first amended petition to terminate or reduce alimony payments.

C. Mr. Grice's third issue

1. The Grices' respective arguments
¶ 42. Mr. Grice's third issue is "[w]hether... the chancellor committed error in awarding [Ms. Grice] $8,057.00 for her attorney's fees and expenses?" Mr. Grice contends that Ms. Grice "simply testified that she could not pay her attorney's fees." His complaint made in support of his second issue that "it is virtually impossible to obtain a true picture of [Ms. Grice's] financial condition" because she chose "to operate only in cash" reappears in his argument on his third issue. Mr. Grice further complains that based upon the seven factors for determining the amount of an attorney's fee which the Mississippi Supreme Court established in McKee v. McKee, 418 So.2d 764 (Miss.1982), Ms. Grice's counsel's testimony about the nature of his services in this case was too vague and indefinite to support the chancellor's award of his fee in the amount of $7,000 and his expenses in the amount of $1,057. Counsel for Ms. *1254 Grice simply counters that his testimony addressed all of the McKee factors and that "[t]he chancellor was correct in awarding Louise $8,057.00 for her attorney's fees and expenses."

2. General Discussion
¶ 43. The issue of whether attorney's fees should be awarded to one party in a divorce action is a question within the discretion of the chancellor. Overstreet v. Overstreet, 692 So.2d 88, 93 (Miss.1997); Hubbard v. Hubbard, 656 So.2d 124, 131 (Miss.1995). If based upon the appropriate standard, this decision will not be reversed upon appeal unless it is found to be manifestly erroneous. Bredemeier v. Jackson, 689 So.2d 770, 778 (Miss.1997). However, the chancellor's discretion is not without limits. Overstreet, 692 So.2d at 93. "Attorneys' fees should not be awarded unless the chancellor finds that the party requesting attorney fees can establish an inability to pay." Id. See Crowe, 641 So.2d at 1105 (finding that there was evidence in the record that wife's monthly expenses exceeded her income and affirming chancellor's award of attorney's fees).
¶ 44. After it has been determined that the work provided by the attorney was reasonably necessary, attorney's fees may be awarded but should be fair and no more than the amount necessary to compensate the attorney for the services he actually rendered. Bredemeier, 689 So.2d at 778. The following factors from McKee, 418 So.2d at 767, provide the guidelines courts use to determine the reasonableness of attorney's fees in domestic cases:
The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
See also Bruce v. Bruce, 687 So.2d 1199, 1203 (Miss.1996) (holding that wife "neither established that she was unable to pay attorney fees" and that she did not present " evidence of any of the McKee factors;" thus "the chancellor cannot be held in error for denying [wife's] request for attorney fees").

3. Ms. Grice's inability to pay her attorney's fee
¶ 45. Mr. Grice acknowledges that Ms. Grice "simply testified that she could not pay her attorney's fees," but he asserts that "it is virtually impossible to obtain a true picture of [Ms. Grice's] financial condition since she admitted that she kept no bank accounts, choosing to operate only in cash." Mr. Grice complains that "in regards to most of her monthly expense which she claimed on her [Rule 8.05] financial statement, and which the Court apparently accepted, [Ms. Grice] produced no documents corroborating her monthly living expenses."
¶ 46. The chancellor found in her bench ruling that "Mrs. Grice's income is from her alimony and rental income from trailer lots and ... a rental house." The chancellor further found that Ms. Grice netted "$100 or less from the rental property leaving her income being the $1,500 per month alimony." We previously dealt with the chancellor's finding that Ms. Grice's expenses according to her financial statement are approximately $2,045 per month. The chancellor found that the total debt which Ms. Grice owed the Bank of Hollandale was $43,216. Mr. Grice called Wesley Cope, chairman of the board and CEO of the Bank of Hollandale, who testified about the four debts which Ms. Grice owed that bank. While Mr. Grice characterized Mr. Cope's testimony as demonstrating Ms. Grice's design and intent to protract the repayment of her debt for as long as she could, Mr. Cope's testimony clearly established that more than one of her debts anteceded her divorce from Mr. Grice. Ms. Grice introduced as a cumulative exhibit several of her medical and other bills which she had been unable to pay. From our review of the foregoing evidence, *1255 we conclude that the chancellor was correct when she found in her bench ruling, which she incorporated into the order from which Mr. Grice has appealed, that "Louise Grice is not able to pay her attorney's fees," and we specifically affirm that finding of fact for which the record contains substantial evidence, notwithstanding Mr. Grice's complaint that his former wife dealt in cash only.

4. The McKee factors

¶ 47. Ms. Grice's counsel testified about the nature and value of his services rendered on her behalf. About the first McKee factor, the skill and standing of the attorney employed, counsel testified that he had been practicing law for approximately twenty-four years. About the second McKee factor, the nature of the case and novelty and difficulty of the questions that issue, as well as the decree of responsibility involved in the management of the cause, Ms. Grice's counsel testified that this case had "been in litigation for an extended period of time," that "[w]e've taken numerous depositions in this case," and that "[t]here have been numerous motions."
¶ 48. Mr. Grice invites our attention to an apparent contradiction in Ms. Grice's counsel's evaluation of the "novelty" of this case. When Ms. Grice's counsel began his testimony, he testified that this case "has been one of the most novel modifications I've ever participated in;" yet later he testified that "[t]his case was not particularly novel initially, but it is novel in the sense that I've had to re-litigate this very similar issue identically again, this time in court." About the third McKee factor, the time and labor required, Ms. Grice's counsel testified, "I've expended, up until Monday, approximately forty-two hours. And since Monday I've estimated aboutit appears we'll finish today sometime, mid afternoon, an additional fourteen hours of trial time." Mr. Grice's counsel cross-examined Ms. Grice's counsel about the necessity for having taken some of the depositions since those persons deposed were not called as witnesses.
¶ 49. About the fourth McKee factor, the usual and customary charge in the community, Ms. Grice's counsel testified that his normal hourly rate was $125. Not surprisingly, Mr. Grice's attorney does not challenge Ms. Grice's counsel's testimony about the "customary charge in the community." With regard to the fifth and final McKee factor, the preclusion of other employment by the attorney due to the acceptance of the case, Ms. Grice's counsel testified, "I do a lot of this kind of practice. There are many other cases I could have been working on had I not been using my time toward this case." During cross-examination, Mr. Grice's counsel attacked Ms. Grice's counsel's estimate of his forty-two hours, which he based upon his review of his file. However, Mr. Grice's counsel did not testify to contradict any testimony offered by Ms. Grice's counsel; neither did he offer testimony from any other member of the Washington County Bar on the McKee factors as the chancellor might apply them in this case.
¶ 50. The chancellor found in the order that "[Ms. Grice's counsel's] fee as testified is reasonable in the amount of $7,000.00 in attorney's fees and $1,057.00 in expenses, for a total of $8,057.00." She then ordered Mr. Grice to pay this sum "within ninety (90) days of this order." Before a chancellor can award one party in a domestic case attorney fees, there must be evidence of the McKee factors outlined above. McKee, 418 So.2d at 767; Holleman v. Holleman, 527 So.2d 90, 95 (Miss.1988), abrogated on other grounds by Smith v. Smith, 607 So.2d 122, 127 (Miss.1992). While the Mississippi Supreme Court frowns upon the estimation of time, it nevertheless opined that "[e]stimates... can properly be considered by the court but the attorney who does so should have a clear explanation of the method used in approximating the hours consumed on a case." McKee, 418 So.2d at 767.
¶ 51. The chancellor's decision to award an attorney's fee in a domestic relations case will not be reversed on appeal unless the appellate court finds the award to be manifestly erroneous. See Bredemeier, 689 So.2d at 778. From its foregoing review of Ms. *1256 Grice's counsel's testimony, the subject of which was the McKee factors as they applied to an evaluation of the amount of his fee, this Court finds no manifest error in the chancellor's award of Ms. Grice's attorney's fee in the amount of $7,000 and expenses in the amount of $1,057 for a total amount of $8,057. The chancellor's award was consistent with the testimony of Ms. Grice's counsel's testimony, which apparently the chancellor found to be credible. Therefore, we affirm it.

D. Mr. Grice's fourth issue

1. Procedural background
¶ 52. After Mr. Grice filed his notice of appeal, he filed a designation of the record pursuant to Rule 10(b)(1) of the Mississippi Rules of Appellate Procedure.[2] Mr. Grice's designation of the record consisted of the trial transcript but only ninety pages of the exhibits. Ms. Grice responded to Mr. Grice's designation of the record by designating an additional 733 pages of exhibits. Mr. Grice responded to Ms. Grice's designating an additional 733 pages of exhibits by filing an application to the trial court requesting an order requiring the appellee to pay expenses for the additional designations. Ms. Grice responded to Mr. Grice's filing his application by reducing the number of exhibits which she had originally designated from 733 to 490 pages. The chancellor entered an order by which she denied Mr. Grice's application to require Ms. Grice to pay the expense for her additional designations. As a result, Mr. Grice incurred an additional expense of $980 to pay for the additional 490 pages of exhibits which he denied were relevant to his issues.

2. The Grices' arguments
¶ 53. Byrd v. F-S Prestress, Inc., 464 So.2d 63, 69 (Miss.1985), is the basis for Mr. Grice's argument because in that case, the supreme court, purely as a matter of dicta, concluded its opinion with the following warning:
We are aware that many appealing attorneys routinely designate the entire course of trial proceedings for transcription, wholly without regard to the nature of the issues to be raised on appeal. The time has come for this practice to stop. We have repeatedly urged the parties to an appeal and their counsel to reduce the bulk of transcripts
"by excluding or omitting portions of the testimony or exhibits not relevant to the issues raised on appeal." City of Mound Bayou v. Roy Collins Const. Co., 457 So.2d 337, 343 (Miss.1984).
What we said in Mound Bayou was an "urging" from this Court. What we say here should be taken as a warning.
Mr. Grice asserts that "the additional 490 pages of exhibits designated by [Ms. Grice] have nothing to do with the issues concerning this appeal." He concludes that if this Court agrees, then this Court "should reverse and render the chancellor's order" and "order [Ms. Grice] to reimburse [Mr. Grice] for the costs of the additional designations."
¶ 54. Ms. Grice responds that she amended her initial designation of additional exhibits to request only four exhibits, which were all the income tax returns of the Grices and of the corporation, Jimmy Grice Seining, Inc., the medical records of Dr. Ben Folk, a Greenville cardiologist, the one-page list of Ms. Grice's medications, and a collective exhibit of bills which Ms. Grice owed. This Court notes that before the trial began, all of the income tax returns were "marked as plaintiff's [Mr. Grice] stipulated collective exhibit No. 1." Collective exhibit No. 1 included all income tax returns from 1991 through 1995 for Jimmy Grice, Sr., Freida Grice, and Jimmy Grice Seining, Inc.

3. Resolution of the issue
¶ 55. Rule 10(b)(4) of the Mississippi Rules of Appellate Procedure disposes of this issue insofar as it provides:

*1257 If the appellee deems inclusion of other parts of the proceedings to be necessary, the appellee shall, within 14 days after the service of the designation and the statement of the appellant, file with the clerk and serve on the appellant and the court reporter a designation of additional parts to be included. The clerk and reporter shall prepare the additional parts at the expense of the appellant unless the appellant obtains from the trial court an order requiring the appellee to pay the expense.
M.R.A.P. 10(b)(4) (emphasis added). Mr. Grice complied with the requirement of Rule 10(b)(4) by filing his application to trial court for order requiring appellee to pay expenses of additional designations. The chancery court entered its order requiring appellant to pay expense of appellee's amended designations, which also complied with the above quoted portion of Rule 10(b)(4). The order complied with Rule 10(b)(4) because it provides that "[t]he clerk and reporter shall prepare the additional parts at the expense of the appellant ...." M.R.A.P. 10(b)(4).
¶ 56. The short answer to Mr. Grice's argument on his fourth issue is that Rule 10(b)(4) required him to pay the extra $980 for the additional 490 pages of exhibits which Ms. Grice requested. A longer answer would be that the cumulative exhibit No. 1 of the income tax returns for the years 1992, 1993, and 1994, which Ms. Grice requested, were potentially relevant to Mr. Grice's first issue, which was that the chancellor erred by refusing to reduce his payment of alimony to his former wife. Two of the other exhibits, Dr. Ben Folk's medical records and the list of Ms. Grice's described medications, were relevant to the issue of Ms. Grice's health and disability. The fourth exhibit, an accumulation of Ms. Grice's bills, was relevant to Mr. Grice's second issue, which was that the chancellor erred in finding that Ms. Grice's monthly expenses were approximately $2,045 and the issue of her health and disability because some of the bills included in this exhibit were from physicians who had treated her. Regardless, this Court affirms the order requiring Mr. Grice to pay the expense of Ms. Grice's additional designations because it was consistent with Mississippi Rule of Appellate Procedure 10(b)(4).

III. CONCLUSION
¶ 57. As the chancellor noted in her bench ruling, "The legal standard in a case such as this isis there a substantial change in circumstances?" The chancellor's extensive findings of fact which she made in her bench ruling and then incorporated into the order denying Mr. Grice's petition and first amended petition to reduce or terminate alimony payments establish that no substantial change in the circumstances of either Mr. Gricefor the worseor Ms. Gricefor the betterhad occurred. Whatever decrease in his income Mr. Grice may have demonstrated from the income tax returns for the years 1991 and 1995 resulted from the "pattern since the last hearing before this Court [in October, 1990] of Jimmy F. Grice's transferring assets in his business to the present Mrs. [Freida] Grice," as the chancellor found based upon substantial evidence. There was also substantial evidence that Jimmy and Freida Grice "expensed" the purchase of three vehicles from the corporation which Freida Grice formed with the assets she purchased from her husband. The evidence was substantial to support the chancellor's finding "that Jimmy F. Grice and the present Mrs. Grice enjoy a very good standard of living." Our standard of review requires that we affirm the chancellor's denial of Mr. Grice's petition and first amended petition to reduce or terminate alimony payments because her decision was supported by substantial evidence and was, therefore, not manifestly wrong.
¶ 58. Neither did the chancellor err in awarding Ms. Grice a total amount of $8,057 in attorney's fees and expenses because her attorney's testimony sufficiently addressed the McKee factors, especially in the absence of affirmative evidence to the contrary, to support her award. The chancellor's refusal to require Ms. Grice to pay the expense of her additional designations of four exhibits, some cumulative, is consistent with Mississippi *1258 Rule of Appellate Procedure 10(b)(4). This Court affirms the order denying Mr. Grice's petition and first amended petition to reduce or terminate alimony payments rendered April 2, 1996, and the subsequent order requiring appellant to pay expense of appellee's amended designations rendered on November 7, 1996.
¶ 59. THE ORDERS OF THE WASHINGTON COUNTY CHANCERY COURT ARE AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and DIAZ, HERRING, HINKEBEIN, KING, PAYNE, and SOUTHWICK, JJ., concur.
NOTES
[1] The portions of Rule 10(b) which are determinative of Mr. Grice's fourth issue read as follows:

(b) Determining the Content of the Record.
(1) Designation of Record. Within seven (7) days after filing the notice of appeal, the appellant shall file with the clerk of the trial court and serve both on the court reporter or reporters and on the appellee a written designation describing those parts of the record necessary for the appeal.
....
(4) Statement of Issues. Unless the entire record, except for those matters identified in (b)(3) of this Rule, is to be included, the appellant shall, within the seven (7) days time provided in (b)(1) of this Rule, file a statement of the issues the appellant intends to present on the appeal and shall serve on the appellee a copy of the designation and of the statement.... If the appellee deems inclusion of other parts of the proceedings to be necessary, the appellee shall, within 14 days after the service of the designation and the statement of the appellant, file with the clerk and serve on the appellant and the court reporter a designation of additional parts to be included. The clerk and reporter shall prepare the additional parts at the expense of the appellant unless the appellant obtains from the trial court an order requiring the appellee to pay the expense.
M.R.A.P. 10(b)(1) and (4) (emphasis added).
[2] Rule 10(b)(1) provides:

Within seven (7) days after filing the notice of appeal, the appellant shall file with the clerk of the trial court ... a written designation describing those parts of the record necessary for the appeal.
M.R.A.P. 10(b)(1).