MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Robert S. Robertson filed suit in the Harrison County Chancery Court against the Chateau LeGrand Property Owner’s Association, Inc. (Association) seeking equitable relief and damages. Robertson alleged that the Association and its predecessors leased, rented, and used his two condominium units at Chateau LeGrand without his consent and knowledge. He also claimed the Association prohibited him from using his time-share rights. The trial was bifurcated into a liability phase and a damages phase. After finding in favor of the Association in the liability portion of the trial, Robertson appeals arguing: (1) his continuing trespass claim is not barred by the statute of limitations and laches; (2) the Association’s amended declarations are invalid; (3) the Association did not have the authority to “lock out” Robertson from his units; and (4) the Association should bear a portion of the appeal costs.
 

 FACTS
 

 ¶ 2. Chateau LeGrand is a condominium complex with fifty platted units located on Beach Boulevard in Biloxi, Mississippi. Its declaration of covenants, conditions and restrictions, and by-laws were adopted in June 1980; the declaration of covenants were amended in August 1981 to include time-shares units or “interval ownership” units.
 

 ¶ 8. In August 1981, Robertson acquired a time-share interest or interval ownership for the twenty-seventh unit week of platted unit 509/living unit 502 (unit 502) and the fifty-second unit week of platted unit 507/living unit 504 (unit 504). Thereafter, in March 1982, Robertson purchased platted unit 101/living unit 110 (unit 110), a wholly owned unit. Robertson went on to purchase a second wholly owned platted unit 304/living unit 307 (unit 307) in April 1982. In August 1984, Robertson conveyed the twenty-fourth unit week of unit 110 to James Juransinki and Nancy Clark; Juransinki and Clark sold the unit week back to Robertson in July 1987. All of these deeds stated that they were subject to the amended declaration of covenants, conditions, and restrictions.
 

 ¶ 4. Robertson testified that he visited his condominiums three to four times per year from the time he purchased them in the early 1980s until the early 1990s. Robertson testified that he stopped paying any maintenance fees or assessment in April or May 1991 because he believed these fees were improperly passed by the board of directors at Chateau LeGrand and the Association.
 

 ¶ 5. In August 1991, Robertson testified that his daughter was barred from entering unit 307 by Clyde Abercrombie, the property manager at that time, due to Robertson’s failure to pay his maintenance fees and assessments to the Association. Robertson stated that he did not return to his condominiums for several years due to the exchange he had with Abercrombie over his daughter being refused access, his
 
 *935
 
 financial conditions, and Hurricane Andrew damaging his other properties in Louisiana. Robertson testified that he subsequently turned off all of the utilities in units 110 and 307.
 

 ¶ 6. In April 1993, Robertson attended a board of directors’ meeting at Chateau LeGrand to discuss his being charged twice for assessments to unit 110. Unit 110 had previously been divided into two units, unit 110A and unit 110B. Robertson did not resolve his billing problem at this board meeting. Robertson was, however, elected to the board of directors for the Association at this meeting due to two other board members’ resigning.
 
 [1]
 

 ¶ 7. Robertson testified that during his visit to his condominiums in April 1993, he discovered six to eight people staying in his unit 110 without his permission or consent. These people were discovered to be members in a band with Abercrombie, the property manager. Robertson evicted them from the unit upon his discovery.
 

 ¶ 8. Meanwhile, due to Robertson’s appointment to the Chateau LeGrand board of directors for the Association, Robertson was added as a plaintiff in a suit filed by the Association against Abercrombie and his various corporations in a cased styled
 
 “Stephen Ward, et al. v. Gulf Landing Resort, Inc., et al.,”
 
 Civil Action Number 22,159 (hereinafter Ward). The plaintiffs sought to stop foreclosures on the properties, remove Abercrombie from the property, appoint a receiver, conduct a full accounting, and recover certain assessments and expenditures due to the misappropriation and commingling of funds by Aber-crombie. One of the specific charges in the
 
 Ward
 
 complaint was that Abercrombie had “without authorization of the owners, rented out whole units or time-share units which did not belong to [Abercrombie].... and converted the proceeds to his own use.” Stephen Ward, a fellow board member, testified that this charge was added to the
 
 Ward
 
 complaint specifically for Robertson. However, Robertson testified that he never signed the amended complaint and did not know he was a named plaintiff.
 

 ¶ 9. On April 30, 1993, Robertson, Ward, and Robert Tyler, an attorney for the plaintiffs in the
 
 Ward
 
 case, went to Chateau LeGrand and informed Abercrombie that he was being terminated as the manager of the property. Ward testified that the night before they expelled Abercrom-bie from Chateau LeGrand, Robertson and Ward met in Robertson’s hotel room in Biloxi. According to Ward, Robertson and Ward made an agreement that Esta McCrory, the new manager at Chateau LeGrand, would be able to stay in his unit IIOA, and Vernon Daigle, another board member, would be able to stay in unit IIOB. The Association would credit Robertson’s account at the condominium for seventy percent of the rental income derived from these two persons renting Robertson’s units, with the other thirty percent being retained by the Association.
 
 [2]
 
 However, there was no documentation of a formal agreement reflecting the above agreement. McCrory testified that she remained in unit 110A for approximately two months, and then she moved to another unit at the condominiums because Robertson wanted to increase her monthly rent.
 

 
 *936
 
 ¶ 10; On May 6, 1993, an oral stipulation was entered in the
 
 Ward
 
 case that provided: McCrory and another individual would be interim managers of the condominium complex; an independent auditor would be appointed; Abercrombie would refrain from managing the premises, other than the units he owned; the 70/30 rental arrangement would continue; there would be no collection of special assessments; and there would be a moratorium placed on the non-use of units by persons who had not paid certain assessments. Tyler testified that Robertson was prepared to testify at this hearing about the improper and unauthorized renting of his condominium units and him not receiving proper credit for the rentals. However, Robertson stated that he was only an observer at this hearing and did not recall being prepped by Tyler to testify.
 

 ¶ 11. On May 9, 1993, a letter, signed by Robertson and the other board members, was sent to all members of the Association. The letter outlined the actions taken at the May 6,1993, hearing, reiterating the 70/30 rental arrangement.
 

 ¶ 12. The minutes of the board’s July 24, 1993, meeting reflected that the board was going to notify Robertson of his “current balance due, taking into account all credits for rentals applied to his account,” and that he must resolve the balance within thirty days or be removed from the board. On July 27, 1993, the board sent a certified letter to Robertson discussing his delinquent balance. Included in this letter were ledgers depicting the charges and credits to each of his wholly owned units and time-share units. The ledgers clearly indicated that Robertson was receiving credit for rental income to unit 110A and HOB. No such entry appears for unit 307 or either of his time-share units. Testimony was given that Robertson never responded to this letter. Another certified letter was sent to Robertson on November 15, 1995, stating that his outstanding balance was approximately $70,560. Robertson did not respond to this letter either.
 

 ¶ 13. In July 1997, the
 
 Ward
 
 judgment was handed down which appointed a receiver for Chateau LeGrand, and required Abercrombie to deed certain properties to the Association and settle certain debts that accumulated while Abercrombie was manager. Especially relevant to the appeal at bar is that the judgment found that both parties agreed that the original declaration of covenants and restriction, the bylaws, and the amended declarations of covenants were the controlling documents for the condominium complex. After receiving the receiver’s report, a second
 
 Ward
 
 judgment was issued in November 1998, which released the receiver and Chateau LeGrand from its duties and obligations under the previous order. No objections or appeals were filed regarding either of the
 
 Ward
 
 judgments.
 

 ¶ 14. In December 1998, Ward, acting on behalf of the Association, sent a letter to Robertson stating that Robertson had a substantial balance of past due maintenance fees on his unit 307. The Association offered to rent unit 307 to decrease his balance, with seventy percent of the rent being credited to his balance. The next month, January 1999, McCrory sent Robertson a letter, per Robertson’s request, outlining the rental activity in unit 110 from April 30, 1993, to December 31, 1993. In May 1999, the Association’s president sent Robertson a letter stating that Robertson should bring his figures in front of the board to compare with the Association’s findings. Again, in August 1999, the board president sent Robertson a letter asking that he present his purported balance to the board. Included in this letter was a very detailed ledger of the fees assessed to Robertson and any rental
 
 *937
 
 credits he received for each of his units. The accounting showed various rentals in unit 110A from July 1994 through November 1998, various rentals in HOB from September 1994 through December 1998, and no rental activity in unit 307. Robertson finally responded to this last letter asking that the Association start with a zero balance. However, Robertson was unable to provide any evidence of when his account had a zero balance. In December 1999, another letter was sent to Robertson stating the Association complied with Robertson’s request and began with a zero balance, and his outstanding balance was approximately $64,993.
 

 ¶ 15. Robertson was reelected to the board in March 1999, notwithstanding that he had yet to pay any of his outstanding balance. Throughout the next several years, the board discussed the problems of association members having delinquent fees. Robertson continued to be one of these delinquent members and was present at the board meetings during these discussions. The problem came to fruition when Robertson filed suit against the Association in January 2000.
 

 ¶ 16. At the conclusion of a lengthy trial, the chancellor found the following: the original declaration of covenants, conditions, and restrictions, the by-laws, and the amended declaration are the controlling documents for the Association; unit 110 is one unit; Robertson’s suit is not a premature derivative action; the statute of limitations and laches bar Robertson’s continuing trespass claim; the Association may suspend a non-paying owner’s space banking right; and the Association’s claims against Robertson for debt prior to May 1999 are barred by the statute of limitations, but the Association may pursue claims from May 16, 1999, to the present. Aggrieved from the chancellor’s ruling, Robertson appeals.
 

 STANDARD OF REVIEW
 

 ¶ 17. This Court employs a limited standard of review on appeals from the chancery court. Great deference is given to the chancellor in his findings of fact, and we will not disturb those findings unless they are found to be manifestly wrong or clearly erroneous, or where the chancellor applied an incorrect legal standard.
 
 In re Allen,
 
 962 So.2d 737, 741(¶ 14) (Miss.Ct.App.2007) (citations omitted). Our job on appeal is to determine whether there “was substantial, credible evidence supporting the chancellor’s findings such that the decision was not manifestly wrong or clearly erroneous.”
 
 Id.
 
 We also recognize that because a chancellor is the only one to hear the testimony of witnesses and observe their demeanor, he or she is in the best position to evaluate a witness’s credibility.
 
 Id.
 

 DISCUSSION
 

 1. Continuing Trespass
 

 ¶ 18. The chancellor found that Robertson’s continuing trespass claim was barred by the statute of limitations and laches. Robertson argues that the statute of limitations for the continuing trespass did not begin to run until 1999, when the Association stopped going into his unit without his consent or knowledge. He argues that each time the Association rented his unit, it committed a trespass so that the statute of limitations did not begin to run until the date of the last entry. There was also testimony that the Association went into Robertson’s units to turn on the cable, telephone, electricity, and to perform pest control. Robertson argues all of this was done without his consent and knowledge and supports his continuing trespass claim. Robertson claims that the three-year catchall statute applies to the continuing
 
 *938
 
 trespass claim, the last act of trespass being in 1999. He filed suit in 2000.
 

 ¶ 19. We must begin with determining whether the discovery rule applies. The “discovery rule” may be applied when a cause of action does not accrue until a plaintiff knows or reasonably should have known of his injury. Gerald Gaggini, Mississippi Limitations of Actions 2d. § 2:05.1 (Jarrod W. Taylor & Thomas B. Walter eds. MLI Press 2006) (citing 54 C.J.S.
 
 Limitations of Actions
 
 § 87 (1987)). Some Mississippi statutes of limitation have an express provision for application of the discovery rule; however, if the discovery rule is not expressly provided for, Mississippi courts have imputed the rule in cases of latent injury.
 
 Id.
 
 (citing
 
 Barnes v. Singing River Hosp. Sys.,
 
 733 So.2d 199, 205(¶ 16) (Miss.1999)) (applying discovery rule to a Mississippi Tort Claims Act case involving latent injuries). There is no express provision for application of the discovery rule for the case at bar, so we must determine whether the discovery rule should be imputed due to a latent injury.
 

 ¶20. A latent injury is one where the plaintiff is “precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question ... [or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act.”
 
 PPG Architectural Finishes, Inc. v. Lowery,
 
 909 So.2d 47, 50(¶ 12) (Miss.2005) (citing
 
 Donald v. Amoco Prod. Co.,
 
 735 So.2d 161, 168(¶ 18) (Miss.1999)). “The term ‘latent injur/ while seemingly vague does have definitive boundaries .... [but][b]ecause there is no bright line rule, the specific facts of the case will determine whether the plaintiff knew or reasonable [sic] should have known that an injury existed.”
 
 Id.
 
 at 51(¶ 14). Accordingly, “if a latent injury is
 
 not
 
 present, the discovery rule would
 
 not
 
 apply.”
 
 Id.
 
 at 50(¶ 11).
 

 ¶ 21. We do not find that the discovery rule is applicable to the facts in the case at bar. Robertson knew that Aber-crombie and the Association had been renting out his unit without his consent as early as 1993 when he discovered Aber-crombie’s bandmates in his unit. Ward and McCrory also testified that the Association sent each member an annual statement that included his or her account balance. They testified that these statements would have reflected any rental activity occurring in his units. This is not a secretive or inherently undiscoverable activity that justifies applying the discovery rule. Accordingly, Robertson’s trespass claims accrued when they occurred, not when he knew or should have known about them.
 

 ¶ 22. The next question is which statute of limitations to apply. A trespass claim for damages arising due to the cutting of timber must be brought within two years of the time the injury was committed.
 
 See
 
 Miss.Code Ann. § 95-5-29 (Rev.2004) and Miss.Code Ann. § 95-5-10 (Rev.2004). Other trespass actions for specific recovery such as fire, damage to fences, barns, gates, bridges, buildings, poultry, livestock, boxing pine trees, taking cottonseed sacks, and boats cast adrift, must be commenced within one year of the date of damage.
 
 See id.
 
 Because we are not dealing with the cutting of timber or any of the other specified recoveries, neither of these statutes apply. Therefore, we must look elsewhere.
 

 ¶ 23. If there is no express statute of limitations for a cause of action, Mississippi applies a general three-year statute of limitations.
 
 See
 
 Miss.Code Ann. § 15-1-49 (Rev.2003). Both parties agree that the general, catch-all three year statute of limitations should apply in this case.
 

 
 *939
 
 ¶24. In determining when the statute of limitations began to run in this matter, we note the following:
 

 In the case of a continuing trespass, the statute of limitations does not begin to run from the date of the original wrong, but rather gives rise to successive causes of action each time there is an interference -with a person’s property. Thus, if there are multiple acts, of trespass, then there are multiple causes of action, and the statute of limitations begins to run anew with each act.
 

 54 C.J.S.
 
 Limitations of Actions
 
 § 202 (2008). Therefore, each time the Association rented out Robertson’s unit or went into Robertson’s unit without his consent or knowledge, a new cause of action was created.
 

 ¶ 25. In his complaint and on appeal, Robertson alleges that a continued trespass occurred in his units from 1991 until 1999. As stated above, a new cause of action arose each time a trespass occurred. Robertson had three years from each trespass to file a cause of action, yet he refrained from taking any action against the Association until he filed his complaint on January 26, 2000. Therefore, by applying the three-year statute of limitations, any claim occurring prior to January 26, 1997, is barred by the statute of limitations.
 

 ¶ 26. The chancellor found that Robertson did not have a claim for any trespass occurring from 1998 to 1999 because Robertson engaged in “actual or passive acquiescence” in the trespass.
 
 [3]
 
 Robertson argues that there is no exception in trespass actions for knowledge, notice, or acquiescence.
 

 ¶ 27. While Robertson is correct that no such exception applies, a claim for trespass can be defeated by the owner consenting to the trespass. “Consent ... may be implied from custom, usage, or conduct. Consent ... will only be applied if the owner has actual knowledge that people have been entering the [property] and fails to take reasonable steps to prevent or discourage them.” 75 Am.Jur.2d.
 
 Trespass
 
 § 73 (2009). “The decisive factor is the interpretation which a reasonable man would put upon the possessor’s acts, in the light of all the surrounding circumstances, and the custom prevailing in the community.”
 
 Marlon Inv. Co. v. Conner,
 
 246 Miss. 343, 350, 149 So.2d 312, 315 (1963).
 

 ¶ 28. Upon viewing the evidence, we find that Robertson implicitly consented to the Association’s actions. As stated above, Robertson discovered members of Abercrombie’s band in his unit in April 1993. It was at this point that McCrory informed Robertson that Abercrombie had been renting his unit as early as 1991. Robertson did nothing more than evict these trespassers. In May 1993, Tyler stated that Robertson was prepared to testify about the improper renting and crediting of his unit in 1993. In July 1993, Robertson was sent a letter reflecting the credits he received on his outstanding balance from the rental activity occurring in units 110A and HOB. He never responded to this letter. McCrory and Ward testified that the Association would send a similar letter to each Association member annually, with their balance and any rental activity taking place in their units. Both testified that Robertson never responded to any of these annual letters. Robertson also testified that he knew the Association had turned his electricity back on in his units, but he admitted doing nothing to
 
 *940
 
 notify the Association or turn off the electricity again. He also testified that he knew that the locks on unit 307 had been changed in 1993, but he did nothing about it. Robertson even admits in his reply brief that he had knowledge and notice of the trespass, but he did nothing to stop it.
 

 ¶ 29. Robertson also testified that he was elected to the board of directors twice during this time, once in 1993 and again in 1999. In addition to being a board member, Robertson attended several other board meetings as a whole unit owner and a time-share owner. However, the minutes reflect that Robertson never took any action regarding these “unauthorized” rentals.
 

 ¶ 30. In reviewing the evidence, we find that Robertson implicitly consented to the Association renting out his unit. He never responded to the letters sent to him, and he never voiced his disapproval of the rentals at the board meetings, or at any other time prior to filing his complaint in the present action. In summary, Robertson never objected to the rentals until he filed his complaint in January 2000, even though he knew that the Association was entering his unit without his consent as early as 1993. Therefore, we do not find error in the chancellor’s finding that Robertson’s continued-trespass claim is untimely. Accordingly, this issue is without merit.
 

 2. Amended Declaration
 

 ¶ 31. The Association’s original declaration, filed on June 4, 1980, provided that the declaration could be amended if “not less than sixty[-]six and two-thirds percent of unit owners” signed the amendment, and the amendment was signed prior to the sale of the first unit. Robertson argues that the amended declarations, filed in August 1981, did not meet either of these requirements. He states that the requisite vote never occurred to amend the declaration, and that the first condominium unit was sold seventeen days prior to the filing of the amended declarations. Robertson argues that these two occurrences render the amended declaration invalid.
 

 ¶ 32. The chancellor found that amended declarations, along with the by-laws and the original declarations, were the governing documents for the Association. She based her decision on two grounds: Robertson presented no evidence regarding the invalidity of the amended declaration, and the parties in
 
 Ward
 
 agreed that the amended declarations were one of the controlling documents for the Association.
 

 ¶ 33. In
 
 Bailey v. Estate of Kemp,
 
 955 So.2d 777, 784 (¶¶ 28-29) (Miss.2007), the supreme court stated:
 

 The defense of laches applies when one party neglects to assert a right or claim, and such neglect, when taken together with any lapses of time and other circumstances causing prejudice to the adverse party, operates as a bar in a court of equity.... The party seeking to invoke the doctrine of laches must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.
 

 ¶ 34. The supreme court addressed the issue of laches in
 
 Morgan v. Morgan,
 
 431 So.2d 1119 (Miss.1983). In late 1980, six children of E.D. Morgan brought a suit against their brother, Wallace Morgan, to cancel a quitclaim deed from E.D. to Wallace as a forgery, and to cancel all claims of interest under the instrument.
 
 Id.
 
 at 1120. In 1966, Wallace filed a quitclaim deed which purported to give him property from his father.
 
 Id.
 
 Thereafter, in 1971, Wallace executed a quitclaim deed to an oil, gas, and mineral lease to an oil compa
 
 *941
 
 ny with the interest to be received by him.
 
 Id.
 
 The trial court found the quitclaim deed to be a forgery and cancelled it.
 
 Id.
 
 However, the oil company’s interest was not invalidated because the six children were estopped from their claim through laches.
 
 Id.
 
 On appeal, the evidence established that 5 of the 6 children had actual knowledge of the quitclaim deed the year it was filed.
 
 Id.
 
 at 1121. The supreme court also found that the children would have had constructive knowledge of the lease through several of their own actions and actions of the oil company.
 
 Id.
 
 at 1121-22. The supreme court found the trial court did not err in its finding that the children were estopped by laches from asserting their claim due to their unreasonable delay in making their claims known.
 
 Id.
 
 at 1122.
 

 ¶ 35. The supreme court also found that laches barred a property owner from asserting her claim in
 
 Twin States Realty Co. v. Kilpatrick,
 
 199 Miss. 545, 26 So.2d 356 (1946). In
 
 Kilpatrick,
 
 the appellee was the owner of three lots and houses.
 
 Id.
 
 at 547, 26 So.2d at 357. Her deeds contained a restriction that the lots should be used solely for residential purposes, and never for commercial purposes.
 
 Id.
 
 Unaware of the restrictions, the appellee began to use one of the main rooms of the residence as a tea room and gift shop.
 
 Id.
 
 at 552, 26 So.2d at 357. Appellee even placed a sign outside the gift shop.
 
 Id.
 
 The appellant, the original owner of the lot, objected to the sign and directed the appellee’s attention to the restriction.
 
 Id.
 
 Appellee removed the sign, but she continued operating the tea room and gift shop.
 
 Id.
 
 The evidence established that for six years, no one, including the appellant, made any other objections to the appellee’s operation.
 
 Id.
 
 at 553, 26 So.2d at 358. On appeal, the supreme court found that laches barred the appellant’s claim.
 
 Id.
 

 ¶ 36. Turning to the case at bar, we find that Robertson’s amended declaration claim against the Association is barred by laches. As stated above, the amended declarations were filed in August 1981. Robertson testified that he first read the amended declarations around the same time he bought unit 110, which was in 1982. In August 1984, Robertson conveyed the twenty-fourth unit week of unit 110 to Juransinki and Clark. The instrument stated that the conveyance was subject to the amended declarations. Robertson testified that he voiced his concern about the invalidity of the amended declarations to an attorney for the Association at this time, and that the attorney stated the problem would be resolved. Robertson testified that when he discovered the amended declaration problem would not be resolved, he bought his unit week back from Juransinki and Clark in July 1987.
 

 ¶ 37. The evidence establishes that Robertson made no effort to correct the alleged problem with the amended declarations after they were passed. He was a member of the board of directors for the Association on two separate occasions and visited other board meetings as a whole unit owner and a timeshare owner, but he never voiced his concern about the alleged invalidity of the amended declarations. He has now waited over fifteen years to take any type of action regarding the amended declaration. Therefore, we find that Robertson’s claim is barred by the defense of laches. Accordingly, this issue is without merit.
 

 3. Lockout
 

 ¶ 38. Robertson testified that in December 1995, the board passed a lockout policy where the Association could lock out a time-share owner if his or her fees were delinquent, charge a 10% annual interest on the balance, cancel reservations, and
 
 *942
 
 prohibit time-share exchanges with the time-share exchange system Resort Condominiums International (RCI). RCI is a space banking system, where, by enrolling in the system, a time-share owner may “bank” unused time from his own unit and spend it in units in RCI’s system located elsewhere. RCI and the Association had a separate agreement that a time-share owner,must be current on his or her balance at the Association in order for the member to be.able to “space bank” their unit with RCI.
 

 ¶39. At approximately the same time the Association passed the above policy preventing a delinquent owner from space banking his or her unit with RCI, the Association also passed a lockout policy whereby the Association would lock delinquent owners out of their units.
 

 ¶40. Robertson states that, under its by-laws and declarations, the Association only has two remedies against a delinquent owner, an action at law or foreclosure. Robertson argues that the Association has no such lockout power under the covenants, and that by allowing the Association to pass such a lockout policy, the chancellor exceeded the principles of equity.
 

 ¶ 41. The chancellor found that by liberally construing portions of the Association’s declarations of covenants, the Association was allowed to suspend delinquent unit owners from space banking their unit with RCI. The chancellor also found that due to Robertson’s refusal to pay his fees and assessments, he came into court with unclean hands.
 

 ¶ 42. Although the chancellor appeared to find that Robertson was dilatory in bringing his lockout claims, we find that Robertson’s lockout claims are also barred by the defense of laches. Robertson testified that, due to his failure to pay his fees and assessments at Chateau LeGrand, RCI would not allow him to space bank his units as early as 1994. He also testified that the Association passed a resolution in 1995 or 1996 permitting both lockout policies. Similar to his amended declarations claim, Robertson sat on his hands for years before taking any action in hopes of deterring the Association from locking him out of his unit and suspending his space banking rights with RCI. Therefore, we find that Robertson’s claims are barred by the defense of laches. This issue is without merit. •
 

 4. Costs
 

 ¶ 43. Robertson argues that the Association should bear the lion’s share of the appeal costs. Robertson states that because he is only appealing the chancellor’s conclusions of law, the record on appeal does not have to be extensive. He argues all that is needed for the present appeal is the chancellor’s order, an order, the condominium by-laws, its original declaration, and amended declaration, and one deed. The remainder of the record, he argues, is unnecessary and irrelevant.
 

 ¶44. The Mississippi Rules of Appellate Procedure dictate that the record on appeal should include all relevant and necessary information. See M.R.A.P. 10. In
 
 Grice v. Grice,
 
 726 So.2d 1242, 1257(¶ 56) (Miss.Ct.App.1998), this Court required the appellant husband to bear the costs of additional designation made by the appellee wife because these additional designations were relevant to the issues being appealed.
 

 ¶ 45. In his first designation of the record, Robertson listed two judgments, two orders, portions of Robertson’s and McCrory’s testimonies, and eleven exhibits. The Association, pursuant to Mississippi Rule of Appellant Procedure 10(b)(4), then filed a supplemental designation of the record. Robertson responded by filing
 
 *943
 
 an amended designation. In his amended designation, Robertson listed the same two judgments and two orders that were listed in his original designation, all of Robertson’s and McCrory’s testimonies, and eighteen exhibits. In his second, and last, amended declaration, Robertson reduced the amount of the record by listing only one judgment, one order, and four exhibits.
 

 ¶ 46. While the final, designated record was voluminous, it contained all the necessary information to render a decision. The testimonies of Robertson, Ward, and McCrory were needed on all three issues to fully grasp the circumstances surrounding each actor, the condominium, and its history. The various board minutes were needed to address issues one and three. The letters that were sent by the board to Robertson were vital to issue one. The various deeds included in the record were necessary to resolve issue two. Moreover, our knowledge of the
 
 Ward
 
 suit would have been minimal without the trial transcript in the present case and the judgment in the
 
 Ward
 
 case. Notwithstanding that the record is very copious, it was necessary and relevant to resolve each issue presented. Accordingly, this issue is without merit.
 

 ¶ 47. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Robertson was subsequently dismissed as a board member in September 1993 due to his delinquent fees.
 

 [2]
 

 . Ward testified that a similar 70/30 rental agreement had been in place at the condominiums since he purchased his time-shares in 1982. McCrory stated this standard policy has continued since she began working as manager for the complex in 1993.
 

 [3]
 

 . The chancellor found that Robertson's claims prior to 1993 were barred by the three-year statute of limitations.